*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

| | |
|---|---|
| TINA SHEPHARD and GEORGETTE WELCH, | UNPUBLISHED<br>January 7, 2021 |
| Plaintiffs-Appellants, | |
| v | No. 350164<br>Genesee Circuit Court |
| BENEVIS, LLC, BENEVIS AFFILIATES, LLC, DAVISON FAMILY DENTISTRY, PC, IRISH ROAD DENTAL, and KARRI KUZMA, | LC No. 18-111050-CZ |
| Defendants-Appellees. | |

Before: BOONSTRA, P.J., and GADOLA and TUKEL, JJ.

PER CURIAM.

In this action alleging wrongful discharge of employment, plaintiffs, Tina Shephard and Georgette Welch, appeal as of right the trial court's opinion and order granting summary disposition under MCR 2.116(C)(10) in favor of defendants. We affirm summary disposition as to Welch in all respects, and we affirm summary disposition as to Shephard as to all counts except the Whistleblower Protection Act (WPA) count, as to which we reverse the order of summary disposition. We also remand the case for further proceedings consistent with this opinion.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

For many years prior to October 2015, Shephard, a dental hygienist, and Welch, a dental assistant, worked for the same dental office and same dentist in Davison, Michigan. When the dental practice was sold in October 2015, plaintiffs were hired by the new owners. The dentist with whom plaintiffs initially worked, who also had become their personal friend, continued to work at the office until February 2017. When that dentist retired, he was replaced on an interim basis by Dr. Prem Misra, D.D.S.. Eventually, in October 2017, Dr. David Ewing, D.D.S. was brought on as the new permanent dentist. After a brief overlap with Dr. Misra, Dr. Ewing became the sole dentist operating at the office.

Almost immediately, plaintiffs began noting that they had issues with Dr. Ewing's dentistry. Primarily, they were concerned that Dr. Ewing was placing crowns and fillings over decaying teeth, which Dr. Ewing himself testified would typically be below the standard of care,

although he denied such conduct. Plaintiffs testified that they reported the suspected malpractice to Karri Kuzma, the dental practice's office manager; Silvestre Gonzalez, the director of operations for defendant Benevis, LLC; and directly to Dr. Ewing.

In November 2017, when Dr. Misra was no longer working at the practice, plaintiffs discovered a questionable insurance billing procedure. Specifically, Dr. Ewing was not yet credentialed with Blue Cross Complete insurance and, therefore, the office could not be paid for treating patients insured with that company. Plaintiffs reviewed the billing information being sent out for those patients and found that their bills had been changed to show Dr. Misra as the treating dentist. At a morning staff meeting in November 2017, at which all of the practice's employees, including Dr. Ewing and Kuzma, were present, Shephard reported her discovery and her belief that the office was committing insurance billing fraud. Plaintiffs testified that Kuzma responded in irritation to the statements by Shephard, and impliedly threatened them with a loss of hours if the office was no longer permitted to see patients with that insurance. Nevertheless, the office stopped seeing patients with Blue Cross Complete insurance until Dr. Ewing obtained the appropriate credentials.

On a separate occasion, although the date is not clear from the record, Shephard was present when Dr. Ewing asked if a patient's insurance covered a snore guard. When he was informed that the service was not covered, he asked whether it was proper for a bite guard to be billed instead and then to submit an invoice to the patient for the remaining money owed. Shephard spoke up and stated that such a billing scheme amounted to insurance fraud. Shephard testified that Dr. Ewing immediately walked out of the room and Kuzma rolled her eyes at Shephard before returning to work.

According to defendants, plaintiffs simply were unable to adapt to a change in dentists and their behavior created a toxic work environment of negativity. Defendants also claimed that plaintiffs were unprofessional. Specifically, it was alleged that plaintiffs reviewed and critiqued Dr. Ewing's work and were rude to coworkers in front of patients. Kuzma and Dr. Ewing testified that plaintiffs were given several oral warnings before Kuzma issued a written warning; plaintiffs denied that such oral warnings had been given. The written document, which was provided to every employee of the dental practice except for Dr. Ewing and Kuzma, identified negativity and a toxic work environment as serious issues in the office. The written warning stated that such behavior had to stop or those responsible could be fired. Plaintiffs testified that they reviewed and signed the written warnings, but that they were told the warnings were not meant for them because Kuzma's and Dr. Ewing's issues were with other employees.

On March 1, 2018, plaintiffs provided a list to Kuzma and Gonzalez of patients they believed to have suffered malpractice by Dr. Ewing. A Benevis-affiliated dentist was called to the office to review Dr. Ewing's challenged work; that dentist determined that there was no malpractice. One week later, during a meeting with Dr. Ewing, Kuzma, and Gonzalez, plaintiffs were fired. In response, plaintiffs sued, alleging a claim of wrongful discharge in violation of public policy (WDPP), and a violation of the WPA, MCL 15.361 *et seq*.

After discovery, plaintiffs moved the trial court for partial summary disposition of their WDPP claim, arguing that Gonzalez admitted during his deposition that one of the reasons plaintiffs were fired was due to their having reported Dr. Ewing's alleged malpractice. Defendants,

in turn, moved for summary disposition of all of the claims against them, asserting that the WDPP claims were preempted by the WPA, or not recognized under binding caselaw, and that the WPA claims had no legal basis, owing to a lack of evidence that plaintiffs were engaged in a protected activity that led to their firing. The trial court granted defendants' motion for summary disposition under MCR 2.116(C)(10). This appeal followed.

## II. CLAIMS UNDER THE WPA

Plaintiffs argue that the trial court improperly granted summary disposition of their WPA claims in favor of defendants. We agree in part and disagree in part.

## A. STANDARD OF REVIEW

Defendants moved the trial court for summary disposition under both MCR 2.116(C)(8) and (C)(10); however, the trial court and the parties rely on significant evidence outside of the pleadings. "When a motion seeks summary disposition under both (C)(8) and (C)(10), but the parties and trial court rely on matters outside of the pleadings, we review the matter through the lens of (C)(10)." *Mazzola v Deeplands Dev Co, LLC*, 329 Mich App 216, 223; 942 NW2d 107 (2019).

A motion for summary disposition under MCR 2.116(C)(10) tests the factual sufficiency of a complaint and is reviewed de novo. *Joseph v Auto Club Ins Ass'n*, 491 Mich 200, 205-206; 815 NW2d 412 (2012). This Court reviews a motion brought under MCR 2.116(C)(10) "by considering the pleadings, admissions, and other evidence submitted by the parties in the light most favorable to the nonmoving party." *Patrick v Turkelson*, 322 Mich App 595, 605; 913 NW2d 369 (2018). Summary disposition "is appropriate if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law." *Id*. "There is a genuine issue of material fact when reasonable minds could differ on an issue after viewing the record in the light most favorable to the nonmoving party." *Allison v AEW Capital Mgt, LLP*, 481 Mich 419, 425; 751 NW2d 8 (2008). "Only the substantively admissible evidence actually proffered may be considered." *1300 LaFayette East Coop, Inc v Savoy*, 284 Mich App 522, 525; 773 NW2d 57 (2009) (quotation marks and citation omitted). "Circumstantial evidence can be sufficient to establish a genuine issue of material fact, but mere conjecture or speculation is insufficient." *McNeill-Marks v Midmichigan Med Ctr-Gratiot*, 316 Mich App 1, 16; 891 NW2d 528 (2016).

The moving party has the initial burden to support its claim with documentary evidence, but once the moving party has met this burden, the burden then shifts to the nonmoving party to establish that a genuine issue of material fact exists. *AFSCME v Detroit*, 267 Mich App 255, 261; 704 NW2d 712 (2005). Additionally, if the moving party asserts that the nonmovant lacks evidence to support an essential element of one of his or her claims, the burden shifts to the nonmovant to present such evidence. *Lowrey v LMPS & LMPJ, Inc*, 500 Mich 1, 7; 890 NW2d 344 (2016). Finally, "[t]he interpretation of the WPA presents a statutory question that this Court reviews de novo." *Wurtz v Beecher Metro Distrib*, 495 Mich 242, 249; 848 NW2d 121 (2014).

## B. LAW AND ANALYSIS

The trial court properly granted summary disposition in favor of defendants regarding plaintiffs' WPA claims related to reporting Dr. Ewing's alleged malpractice and Welch's WPA claim related to reporting insurance and billing fraud. But the trial court improperly granted summary disposition of Shephard's WPA claim with respect to her reports of actual and proposed insurance and billing fraud.

Plaintiffs argue that the trial court improperly granted summary disposition in favor of defendants despite there being factual questions regarding their WPA claims. A recent decision by this Court provides the appropriate process for engaging in statutory interpretation of the WPA statutory scheme:

> The paramount rule of statutory interpretation is that we are to effect the intent of the Legislature. To do so, we begin with the statute's language. If the statute's language is clear and unambiguous, we assume that the Legislature intended its plain meaning, and we enforce the statute as written. In reviewing the statute's language, every word should be given meaning, and we should avoid a construction that would render any part of the statute surplusage or nugatory. [*PNC Nat'l Bank Ass'n v Dep't of Treasury*, 285 Mich App 504, 506; 778 NW2d 282 (2009), quoting *Wickens v Oakwood Healthcare Sys*, 465 Mich 53, 60; 631 NW2d 686 (2001).]

"Unless defined in the statute, every word or phrase of a statute should be accorded its plain and ordinary meaning, taking into account the context in which the words are used." *In re Smith Estate*, 252 Mich App 120, 124; 651 NW2d 153 (2002). However, "technical words and phrases, and such as may have acquired a peculiar and appropriate meaning in the law, shall be construed and understood according to such peculiar and appropriate meaning." MCL 8.3a.

## 1. PROTECTED ACTIVITY UNDER THE WPA

Under the WPA, in pertinent part, "[a]n employer shall not discharge . . . an employee . . . because the employee, or a person acting on behalf of the employee, reports . . . a violation or a suspected violation of a law or regulation or rule promulgated pursuant to a law . . . to a public body, unless the employee knows that the report is false . . . ." MCL 15.362. Stated differently, "[t]he WPA provides a remedy for an employee who suffers retaliation for reporting or planning to report a suspected violation of a law, regulation, or rule to a public body." *Anzaldua v Neogen Corp*, 292 Mich App 626, 630; 808 NW2d 804 (2011). "A prima facie case under the WPA arises when (1) the plaintiff was engaged in protected activity as defined by the act, (2) the plaintiff was discharged or discriminated against, and (3) a causal connection exists between the protected activity and the adverse employment decision." *Id*. at 630-631, citing *Shaw v Ecorse*, 283 Mich App 1, 8; 770 NW2d 31 (2009). This appeal involves the first and third elements listed above.

As regards the first requirement, "[t]he protected activities listed in the act consist of reporting or being about to report a violation of a law, regulation, or rule, or being requested by a public body to participate in an investigation, hearing, inquiry, or court action." *Wurtz*, 495 Mich at 251 n 13. The parties do not dispute that, for the purposes of this appeal, Dr. Ewing, as a licensed dentist, is a "public body" under the WPA. See MCL 15.361(d)(*iv*) (defining a "public body," in

-4-

relevant part as any "body which is created by state or local authority or which is primarily funded by or through state or local authority, or any member or employee of that body"); *McNeil-Marks v Midmichigan Med Ctr-Gratiot*, 316 Mich App 1, 22-3; 891 NW2d 528 (2016) (holding that a private attorney, as a member of the State Bar of Michigan, is a "public body" under the WPA).

## 2. REPORTS OF MALPRACTICE AS PROTECTED ACTIVITY

The first element of a prima facie WPA claim also requires that plaintiffs reported or were about to report a violation of a law or regulation or rule promulgated pursuant to law of this state. MCL 15.362. Defendants do not dispute that submitting a claim to Blue Cross which falsely stated that services were provided by a different dentist would constitute a violation of law. The parties disagree, however, on whether plaintiffs' reporting of suspected malpractice fell under the WPA. In *Landin v Healthsource Saginaw, Inc*, 305 Mich App 519, 532-533; 854 NW2d 152 (2014), this Court provided the following dispositive analysis of the issue:

> [The] plaintiff did not originate a report or complaint alleging a violation of the Public Health Code, he accused a coworker of malpractice. To establish a cause of action for medical malpractice "a plaintiff must establish four elements: (1) the appropriate standard of care governing the defendant's conduct at the time of the purported negligence, (2) that the defendant breached that standard of care, (3) that the plaintiff was injured, and (4) that the plaintiff's injuries were the proximate result of the defendant's breach of the applicable standard of care." *Craig v Oakwood Hosp*, 471 Mich 67, 86; 684 NW2d 296 (2004). There is no requirement that in order to establish a claim of malpractice, one must necessarily allege a violation of the Public Health Code.

Consequently, reports of suspected malpractice are not covered by the WPA. *Id*. Moreover, similarly to *Landin*, plaintiffs cannot point to any specific law, code, or regulation of the public health code, MCL 333.1101 *et seq*., which Dr. Ewing allegedly violated. Instead, as discussed in Section III, plaintiffs identified only MCL 333.20176a(1)(a), which prohibits a health facility from discharging or disciplining an employee for reporting malpractice, but does not regulate a medical professional's proper practice or prohibit a medical professional from committing malpractice. Thus, by reporting Dr. Ewing's alleged malpractice, plaintiffs were not reporting a violation of a law, code, or regulation. Consequently, with respect to the malpractice issue, plaintiffs were not engaged in a protected activity, and, therefore, those claims did not fall under the WPA. See *Landin*, 305 Mich App at 532-533; MCL 15.362.

## 3. WHAT CONSTITUTES "REPORTING" A VIOLATION OF LAW?

Plaintiffs' insurance claims, however, are another matter. There is no dispute that the facts of this case, considered in the light most favorable to plaintiffs, reveal that Shephard reported two instances of either actual or proposed insurance fraud. Indeed, the record shows that Shephard reported the Blue Cross Complete insurance issue at a morning meeting of the entire office, including Dr. Ewing, and specifically reported to Dr. Ewing that he could not bill a snore guard, which was not a covered item, as a bite guard, which was covered. The parties do dispute, however, whether Welch reported those issues. Importantly, the WPA provides that a person who reports a violation of law on behalf of someone else engages in protected activity. See MCL

15.362. Thus, the relevant question is whether the trial court erred by concluding the undisputed facts demonstrated that Shephard reported the insurance fraud on her own behalf only, but did not also do so on behalf of Welch.

Here, during Welch's deposition testimony, she was specifically asked if she had "some sort of discussion where you guys sort of agreed that she would be the one who did the talking?" Welch stated, "No. Tina [Shephard is] very outspoken. That was Tina." Two questions later, Welch's answer reiterated that when Shephard spoke, Welch "hadn't asked her to do so[.]" Nevertheless, Welch did contend that Shephard was reporting violations of law on her behalf, noting that Shephard used the word "we" when discussing the Blue Cross Complete insurance fraud.

When analyzing this question, the trial court relied on an order from our Supreme Court, which reversed an unpublished opinion of this Court and adopted the analysis in the dissent. *Mudge v South Lyon*, 459 Mich 874; 585 NW2d 303 (1998). In that case, Betty Mudge, who worked for the city of South Lyon, informed her husband, Ray Mudge, that her boss personally cashed a check that rightfully belonged to the city. *Mudge v South Lyon*, unpublished per curiam opinion of the Court of Appeals, issued June 27, 1997 (Docket No. 194363), p 1, rev'd 459 Mich 874 (1998). Ray, in turn, contacted a friend and police officer, Eric Mayernik, regarding the issue, which eventually resulted in a criminal investigation of Betty's boss. *Id*. Shortly thereafter, South Lyon informed Betty that she was being suspended for two weeks, and she sued under the WPA. *Id*. The trial court granted summary disposition in favor of South Lyon, reasoning that Betty was not engaged in a protected activity. *Id*. at 2-3. On appeal, the majority reversed, holding that both Ray and Mayernik could be determined to have been acting on Betty's behalf under the WPA. *Id*.

The dissenting judge, however, would have held that Ray and Mayernik were not acting on Betty's behalf. *Id*. (M. J. KELLY, J., dissenting), at 2. The dissent provided the following analysis:

> Betty did not report the . . . incident to Erik Mayernik or to any member of a public body. Neither did she instruct her husband Ray to report the violation on her behalf. Ray did not inform Betty beforehand that he planned to consult Mayernik; she found out that he had done so only after the fact. While it is true that Betty was the "unwitting source" of information concerning the misuse of public funds, she was not the whistleblower. [*Id*.]

On that ground, among others, the dissent would have affirmed the trial court's order granting South Lyon's summary disposition motion. *Id*. at 2-3. Subsequently, South Lyon applied for leave to appeal with our Supreme Court. In lieu of granting that application, the Supreme Court entered the following order: "[W]e REVERSE the judgment of the Court of Appeals and REINSTATE the order of the Oakland Circuit Court on the claims under the [WPA], for the reasons set forth in the dissenting opinion in the Court of Appeals." *Mudge*, 459 Mich at 874 (citations omitted).

The trial court was correct to rely on our Supreme Court's order in *Mudge*, because "[a]n order of [the Michigan Supreme] Court is binding precedent if it constitutes a final disposition of an application and contains a concise statement of the applicable facts and reasons for the decision." *DeFrain v State Farm Mut Auto Ins Co*, 491 Mich 359, 369; 817 NW2d 504 (2012).

-6-

*DeFrain* noted that the required "concise statement of the applicable facts and reasons for the decision . . . can be satisfied by referring to another opinion." *Id.* at 369. In *Mudge* and in *DeFrain*, the opinion to which the Supreme Court's order referred was a Court of Appeals dissenting opinion. *DeFrain*, 491 Mich at 369-370. Consequently, the analysis in the dissenting opinion in *Mudge* is binding on the basis of the Supreme Court's order adopting that analysis in an order. See *DeFrain*, 491 Mich at 369; *Mudge*, 459 Mich at 874; *Mudge* (M. J. KELLY, J., dissenting), at 2-3.

Thus, under the holding announced in the *Mudge* dissent, there must be evidence of some form of agreement between the source of the information and the whistleblower that the whistleblower is acting on behalf of the source, and not merely using information provided by the source. *Mudge*, 459 Mich at 874; *Mudge* (M. J. KELLY, J., dissenting), at 2. In other words, for a source who does not personally report a violation of law to come within the protections of the WPA, there must be an agreement between the source and the whistleblower, *before* the whistleblower makes a report, that the whistleblower is making the report on behalf of the source.[1] *Mudge* (M. J. KELLY, J., dissenting), at 2.

In this case, when asked whether she and Shephard had "some sort of discussion where you guys sort of agreed that she would be the one who did the talking," Welch testified that they did not. Indeed, Welch's testimony established that Welch had no agreement for Shephard to speak on behalf of Welch, but only sat in silence as Shephard spoke. Under the Supreme Court's holding in *Mudge*, Welch's quietly agreeing with Shephard was not enough to qualify as protected activity under the WPA.[2] Consequently, the trial court properly granted summary disposition as to Welch's WPA claims. See *Mudge* (M. J. KELLY, J., dissenting), at 2; MCL 15.362.

### 4. CAUSAL CONNECTION BETWEEN PROTECTED ACTIVITY AND ADVERSE EMPLOYMENT ACTION

To summarize, after analyzing the first prima facie requirement of plaintiffs' WPA claims, we are left only with Shephard's claim that she was fired because she reported potential billing and insurance fraud to Dr. Ewing. The second prima facie requirement for a WPA claim—that

---

[1] This case does not present the question of what is necessary to constitute such an agreement, or whether it can be implicit rather than express, other than the statutory requirement that the report itself be made "verbally or in writing." MCL 15.362.

[2] In arguing that this conclusion is incorrect, plaintiffs direct this Court to testimony from Welch and Dr. Ewing showing that Welch reported Dr. Ewing's malpractice to Dr. Ewing and others by presenting x-rays of crowns being placed over decaying teeth. But, as previously discussed, reporting malpractice is not a protected activity under the WPA and, therefore, Welch's direct reporting of that alleged malpractice to Dr. Ewing does not change our analysis. See *Landin*, 305 Mich App at 532-533; MCL 15.362. Instead, the only remaining potential WPA claim turns on whether Welch reported or had Shephard report for her the purported insurance and billing fraud. From her own testimony, the record allows for no other conclusion than that Welch did not report those purported legal violations to Dr. Ewing, nor did she have an agreement for Shephard to so report them. This fact is fatal to Welch's WPA claims. See MCL 15.362; *Mudge*, 459 Mich at 874; *Mudge* (M. J. KELLY, J., dissenting), at 2-3.

Shephard suffered an adverse employment action—is undisputedly fulfilled because Shephard was fired. See *Anzaldua*, 292 Mich App at 630. Thus, the final element of the WPA claim is whether there was a causal connection between Shephard's protected activity of reporting insurance and billing fraud to Dr. Ewing and her ultimate firing. *Id*. at 630-631.

"Because whistleblower claims are analogous to other antiretaliation employment claims brought under employment discrimination statutes prohibiting various discriminatory animuses, they should receive treatment under the standards of proof of those analogous [claims]." *Debano-Griffin v Lake Co*, 493 Mich 167, 175-176; 828 NW2d 634 (2013) (quotation marks and citation omitted; alteration in original). "Absent direct evidence of retaliation, a plaintiff must rely on indirect evidence of his or her employer's unlawful motivations to show that a causal link exists between the whistleblowing act and the employer's adverse employment action." *Id*. at 176. The parties disagree regarding whether there was "direct evidence of retaliation." *Id*. "Direct evidence of retaliation is evidence that, if believed, requires the conclusion that retaliatory animus was 'at least a motivating factor in the employer's actions.' " *Rivera v SVRC Indus, Inc*, 327 Mich App 446, 457; 934 NW2d 286 (2019), quoting *McNeil-Marks*, 316 Mich App at 18. In support of their allegation that they provided direct evidence of retaliation, plaintiffs direct this Court to Gonzalez's deposition testimony. The testimony by Gonzalez, however, relates solely to plaintiffs' allegations of malpractice. In short, Gonzalez stated that he believed plaintiffs' inability to accept Dr. Ewing as the new dentist for the practice was exhibited by their inability to accept the conclusions of other dentists that Dr. Ewing had not committed malpractice. Regardless of whether this would be "direct evidence of retaliation" on the basis of reported malpractice, it is inapplicable to the present issue because, as discussed, the only remaining potential WPA issue relates to Shephard's reporting of insurance and billing fraud. Plaintiffs provide this Court with no citation to direct evidence of retaliation as related to Shephard's protected activity, and indeed, having reviewed the entire record, there is none.

In light of the lack of direct evidence of retaliation, "this case requires application of the burden-shifting framework set forth in *McDonnell Douglas* [*Corp v Green*, 411 US 792; 93 S Ct 1817; 36 L Ed 2d 668 (1973)]." *Debano-Griffin*, 493 Mich at 176. "A plaintiff may present a rebuttable prima facie case on the basis of proofs from which a factfinder could infer that the plaintiff was the victim of unlawful retaliation." *Id*. (quotation marks, citation, emphasis, and alteration omitted). "[W]hen a plaintiff presents circumstantial evidence of retaliation, the burden then shifts to the defendant to rebut the presumption of a causal connection by articulating a legitimate business reason for its adverse employment action." *Rivera*, 327 Mich App at 458. Finally, "[i]f the defendant offers such a reason, the burden shifts back to the plaintiff to show that a genuine issue of material fact still exists by showing that a reasonable fact-finder could still conclude that the plaintiff's protected activity was a motivating factor for the employer's adverse action . . . ." *Id*. (quotation marks and citation omitted). For example, a plaintiff could present evidence "that the employer's articulated legitimate reason was a pretext disguising unlawful animus." *Id*. (quotation marks and citation omitted).

The first question, then, is whether plaintiffs provided sufficient circumstantial evidence that Shephard was fired for reporting the alleged billing and insurance fraud. When making such a case, a "[p]laintiff must show something more than merely a coincidence in time between protected activity and adverse employment action." *West v Gen Motors Corp*, 469 Mich 177, 186; 665 NW2d 468 (2003). In other words, "[t]emporal proximity, without more, is insufficient to

-8-

prove a causal connection between the protected activity and any adverse employment action." *Rivera*, 327 Mich App at 466.

The record in this case shows, without dispute, that Shephard was fired on March 8, 2018. Shephard testified that she discovered that the dental office was changing the name of the treating dentist from Dr. Ewing to Dr. Misra for patients with Blue Cross Complete insurance. This was being done because Dr. Ewing was not properly credentialed with Blue Cross Complete insurance, and thus, could not be paid for the services rendered. The office made the change and sent out bills with Dr. Misra as the treating dentist despite the fact that Dr. Misra no longer worked at the facility. At a morning staff meeting in November 2017, Shephard reported to Dr. Ewing that she had discovered the billing fraud and commented on its illegality. Both plaintiffs testified that Kuzma reacted in a negative manner, suggesting that the office needed to treat those patients and be paid in order for there to be enough work for everyone. Indeed, plaintiffs stated that Kuzma's response was essentially a threat—allow the fraudulent billing to go forward or be faced with a reduction in work hours.

Shephard's testimony that she reported the Blue Cross Complete insurance billing fraud was supported by Welch's testimony that Shephard spoke up at a morning meeting. Furthermore, on November 15, 2017, Kuzma e-mailed Claire Swindle, the human resources director for Benevis, LLC, asking how to handle the issue involving Dr. Ewing's credentials with Blue Cross Complete insurance. This supports Shephard's assertion that she was the first to raise the issue in November 2017, and that Kuzma was hesitant to stop seeing the patients. Indeed, it was Swindle that ultimately clarified that patients insured with Blue Cross Complete should no longer be scheduled at the office until Dr. Ewing's credentials were obtained. Swindle also explicitly stated that the dental office should not be billing under Dr. Misra's name.

The next issue raised by Shephard was in regard to Dr. Ewing's request for information on whether a patient's insurance covered a snore guard. When it was determined that the insurance did not cover that device, Dr. Ewing inquired whether they could bill the snore guard as a bite guard to the insurance company, then invoice the patient for the remaining balance. Shephard, who was listening to the conversation, informed Dr. Ewing that she believed such a billing practice would be illegal. Upon hearing Shephard's response, Dr. Ewing walked out of the room where the discussion was occurring. Shephard testified that she also observed Kuzma roll her eyes at the comment regarding the legality of Dr. Ewing's proposed billing scheme.

Plaintiffs argue that the trial court erred when it determined that such evidence did not allow for an inference that Shephard's firing was caused by her reporting of proposed billing and insurance fraud. While our Supreme Court has held that temporal proximity, without more, is not enough to create a jury question regarding causation, it also has provided guidance regarding what could be considered exacerbating factors. Specifically, in *West*, 469 Mich at 186-187, the Supreme Court provided an example of a case in which a genuine issue of material fact existed regarding circumstantial evidence of causation. "A case in which a close temporal relationship supported [a] plaintiff's claim is *Henry v Detroit*, 234 Mich App 405; 594 NW2d 107 (1999)." *West*, 469 Mich at 186. The Supreme Court continued, reasoning that, "unlike [the] plaintiff [in *West*], the plaintiff in *Henry* also presented evidence that his superior expressed clear displeasure with the protected activity engaged in by the plaintiff." *West*, 469 Mich at 186-187. The *West* Court honed in on the fact that the plaintiff in the case before it had "not shown any reaction or conduct on the

part of his supervisors that reasonably suggests that they were upset by the fact that [the] plaintiff'' engaged in the protected activity. *Id*. at 187.

The present case is more comparable to *Henry*, 234 Mich App at 414, than it is to *West*, 469 Mich at 186-187. In *Henry*, 234 Mich App at 414, the plaintiff was forced to choose between either a demotion or retirement about four months after engaging in protected activity under the WPA. The plaintiff in *Henry* testified that, after he engaged in the protected activity, he heard his supervisor "was upset and believed that [the] plaintiff's [protected activity] was going to cost the [defendant] a lot of money." *Id*. The plaintiff also stated that his supervisor "treated [the] plaintiff differently than he had in the past," after the plaintiff had engaged in the protected activity. *Id*.

Like the plaintiff in *Henry*, Shephard testified that her reporting of insurance fraud was met with distaste by supervisors. In pertinent part, Kuzma immediately reacted in a negative manner when Shephard raised the Blue Cross Complete issue, noting that Shephard might face a reduction in hours should patients with that insurance be removed from the schedule. Welch's testimony was similar, noting Kuzma's irritation with the issue, and her making veiled threats of reduced hours. Although there was no discussion of a reaction from Dr. Ewing to that information, Shephard testified that he walked out of the room where they were speaking when she informed him that his proposed plan to bill the snore guard as a bite guard was illegal. During that altercation, Kuzma, by rolling her eyes, again showed disdain for Shephard's objection to the office fraudulently billing an insurance company. In addition to these signs of disapprobation from her supervisors, Shephard, like the plaintiff in *Henry*, also was fired about four months after engaging in the protected activity.

In *West*, 469 Mich at 186-187, our Supreme Court identified *Henry* as an example of the combination of temporal proximity and exacerbating circumstances being sufficient to survive a motion for summary disposition. Given the legal similarity of that case to the present case, the trial court erred in concluding that summary disposition was proper on that basis. Nevertheless, we must consider the other burden-shifting factors.

Since Shephard "establishe[d] a prima facie case, a presumption of [retaliation] arises because an employer's adverse action is more likely than not based on the consideration of impermissible factors—for example, here, plaintiff's protected activity under the WPA—if the employer cannot otherwise justify the adverse employment action." *Debano-Griffin*, 493 Mich at 176 (quotation marks, and citation omitted; second alteration in original). "The employer, however, may be entitled to summary disposition if it offers a legitimate reason for its action and the plaintiff fails to show that a reasonable fact-finder could still conclude that the plaintiff's protected activity was a 'motivating factor' for the employer's adverse action." *Id*.

The record in this case is replete with evidence from Dr. Ewing, Kuzma, and Gonzalez, regarding plaintiffs' various shortcomings as employees. Dr. Ewing testified that Shephard had a bad attitude, created what he considered a toxic culture of negativity, and spoke poorly about his work in the presence of patients. Kuzma agreed, adding that Shephard was also rude and disruptive with other staff members when patients were present. Kuzma reiterated that Shephard disliked Dr. Ewing to a great extent and that this made it uncomfortable for the two to work together. Gonzalez, who was not in the office on a regular basis, testified that he regularly heard that same information from Dr. Ewing and Kuzma. Gonzalez stated his belief that Shephard did not like the change in

dentists in the practice, and that her failure to adapt was harming the office's business. Furthermore, defendants additionally highlighted an incident in which Shephard claimed that a patient left the practice because that patient was unhappy with the quality of Dr. Ewing's work. Dr. Ewing contacted that patient and learned that Shephard's claims were false and that the patient would return to Dr. Ewing's care after an unrelated oral procedure was completed. Finally, as for documentary evidence, defendants relied heavily on a written warning that was provided to Shephard, which discussed the various problems occurring in the office and which directed the employees to work toward fixing them.

In contrast, Shephard testified that she reviewed the written warning and signed it. But she also noted that it was provided to everyone in the office and that she specifically asked Dr. Ewing about the statements in the written warning, and he told her that it did not apply to her. Shephard also testified that she simply did not engage in the various activities alleged by Dr. Ewing, Kuzma, and Gonzalez. Shephard stated that she was not overly negative, did not speak negatively about Dr. Ewing's work in front of patients, and was not rude to other staff members. Welch agreed with Shephard, noting that she was also told that the written warning did not apply to her and that there was not an office-wide problem with negativity caused by Shephard.

This factual scenario presents a classic situation of a question of fact for a jury to determine. Dr. Ewing, Kuzma, and Gonzalez testified that Shephard had a bad attitude, acted unprofessionally, and was uncomfortable to be around. Shephard, on the other hand, denied those allegations, claiming that she was a good employee who had been fired because she refused to sit by while the office committed insurance and billing fraud. Defendants contend that the factual dispute can be resolved by the fact that the dental practice stopped seeing patients insured with Blue Cross Complete and never billed for the bite guard in lieu of the snore guard. In support of that, defendants refer this Court to documentary evidence that the dental office repaid some money to Blue Cross Complete to remedy the error of billing under Dr. Misra's name.

Rather than being evidence that resolves the question of fact in defendants' favor, the documentary evidence of the repayment actually muddies the waters. The fact that the dental practice had to stop seeing a significant number of patients with a particular type of insurance due to Shephard's discovery of and reporting of insurance fraud provided a motive—loss of income—for defendants to have retaliated against Shephard. The motive is accentuated by the reimbursement made to Blue Cross Complete. Specifically, in addition to stopping the dental practice from seeing certain patients going forward, Shephard's reporting of billing fraud resulted in her employers losing money out-of-pocket, in the amount of approximately $3,000, which had to be repaid to the insurance company. In addition, Shephard's actions regarding the snore guard presumably resulted in those services and the item not being billed.

In sum, while defendants attempt to portray the evidence as proof that they took Shephard's input seriously and cured the errors she identified, it also suggests that they lost money because Shephard refused to stay quiet about what she identified as insurance and billing fraud. Thus, considering Shephard's and Welch's denials of the reasons defendants cite as legitimate bases for terminating Shephard's employment, and the further evidence that defendants had a motive to fire Shephard, there was sufficient proof "that a reasonable fact-finder could still conclude that [Shephard]'s protected activity was a 'motivating factor' for the employer's adverse action." *Debano-Griffin*, 493 Mich at 176. Consequently, by granting defendants' motion for summary

disposition as to Shephard's WPA claim regarding the reporting of insurance and billing fraud, the trial court erred, and we now reverse as to that issue only. *Id.*; *West*, 469 Mich at 186-187; *Henry*, 234 Mich App at 414.[3]

## III.  WDPP CLAIMS

Plaintiffs argue that the trial court improperly granted summary disposition as to their WDPP claims in favor of defendants.  We disagree.

## A.  STANDARD OF REVIEW

The same standard of review for issues involving summary disposition under MCR 2.116(C)(10) discussed earlier in this opinion applies here.  "Issues of statutory interpretation are reviewed de novo." *City of Riverview v Sibley Limestone*, 270 Mich App 627, 630; 716 NW2d 615 (2006).

## B.  LAW AND ANALYSIS

Plaintiffs argue that the trial court misapplied relevant and binding caselaw regarding their WDPP claims.  There is no dispute in this case that plaintiffs were at-will employees. "Consequently, [their] employment was terminable at any time and for any—or no—reason, unless that termination was contrary to public policy." *Kimmelman v Heather Downs Mgt Ltd*, 278 Mich

---

[3] In an effort to escape this conclusion, defendants argue that the claims against Kuzma should be dismissed because she did not have the authority to fire Shephard, and the claims against Benevis, LLC, should be dismissed because that legal entity did not employ Shephard.  In Kuzma's deposition, however, she testified that she was one of three individuals who jointly decided to fire Shephard, along with Dr. Ewing and Gonzalez.  Moreover, Gonzalez testified that he was employed by Benevis, LLC, and defendants produced an e-mail in which Gonzalez lists that company as his employer.  Gonzalez, on behalf of Benevis, LLC, testified that he was part of the decision to fire Shephard.  To rehabilitate the testimony of Kuzma and Gonzalez, defendants rely on affidavits by Kuzma and Gonzalez attempting to contradict and correct their deposition testimony.  This argument by defendants is unavailing.  Arguably the affidavits run afoul of the rule "that parties may not contrive factual issues merely by asserting the contrary in an affidavit after having given damaging testimony in a deposition." *Dykes v William Beaumont Hosp*, 246 Mich App 471, 480; 633 NW2d 440 (2001) (quotation marks and citation omitted).  Here, of course, defendants seek to do the opposite—to establish the *absence* of a factual issue by contradicting earlier deposition testimony, such that summary disposition would be proper.  We need not determine whether such a practice is prohibited, because we are required to apply the well-established rule that in considering a motion for summary disposition, we construe the evidence in the light most favorable to the non-moving party.  See *Turkelson*, 322 Mich App at 605.  In that context, even if the affidavits are otherwise properly part of the record, we nevertheless would have to overlook them because construing all of the evidence in the light most favorable to plaintiffs would require us to rely on the statements made in the depositions, as those are the most favorable version of events to plaintiffs.  Consequently, these brief alternative arguments by defendants are without merit and do not change the analysis on these issues. *Id.*

App 569, 572-573; 753 NW2d 265 (2008). In other words, "an exception has been recognized to [the general] rule, based on the principle that some grounds for discharging an employee are so contrary to public policy as to be actionable." *Suchodolski v Mich Consol Gas Co*, 412 Mich 692, 695; 316 NW2d 710 (1982). Our Supreme Court has held that "public policy" is "more than a different nomenclature for describing the personal preferences of individual judges," and instead, requires a judge "to determine from objective legal sources what public policy *is*, and not to simply assert what such policy *ought* to be on the basis of the subjective view of individual judges." *Terrien v Zwit*, 467 Mich 56, 66; 648 NW2d 602 (2002). In light of that law regarding public policy, this Court provided the following guidance in cases involving allegations that the WDPP was violated:

> [T]he only grounds that have been recognized as so violative of public policy that they serve as an exception to the general rule of at-will employment are: (1) explicit legislative statements prohibiting the discharge, discipline, or other adverse treatment of employees who act in accordance with a statutory right or duty (e.g., the Civil Rights Act, MCL 37.2701; the Whistleblowers' Protection Act, MCL 15.362; the Persons With Disabilities Civil Rights Act, MCL 37.1602), (2) where the alleged reason for the discharge was the failure or refusal of the employee to violate a law in the course of employment (e.g., refusal to falsify pollution reports; refusal to give false testimony before a legislative committee; refusal to participate in a price-fixing scheme), and (3) where the reason for the discharge was the employee's exercise of a right conferred by a well-established legislative enactment (e.g., retaliation for filing workers' compensation claims). [*Landin*, 305 Mich App at 524.]

These three grounds for a WDPP claim are consistent with our Supreme Court's pronouncement that public policy violations are "[m]ost often . . . found in explicit legislative statements prohibiting the discharge, discipline, or other adverse treatment of employees who act in accordance with a statutory right or duty." *Suchodolski*, 412 Mich at 695.

In the instant case, we must first address defendants' argument that plaintiffs' WDPP claims are preempted by the WPA. Defendants are correct that "[t]he remedies provided by the WPA are exclusive and not cumulative." *McNeil-Marks*, 316 Mich App at 25 (quotation marks and citation omitted). And, consequently, "when a plaintiff alleges discharge in retaliation for engaging in activity protected by the WPA, '[t]he WPA provides the exclusive remedy for such retaliatory discharge and consequently preempts common-law public-policy claims arising from the same activity.' " *Id.*, quoting *Anzaldua*, 292 Mich App at 631. Indeed, the public health code itself provides, in relevant part, that employees who report violations of its sections are protected under the WPA:

> A person employed by or under contract to a health facility or agency or any other person acting in good faith who makes a report or complaint including, but not limited to, a report or complaint of a violation of this article or a rule promulgated under this article; who assists in originating, investigating, or preparing a report or complaint; or who assists the department in carrying out its duties under this article is immune from civil or criminal liability that might

-13-

otherwise be incurred and is protected under the whistleblowers' protection act, 1980 PA 469, MCL 15.361 to 15.369. [MCL 333.20180(1).]

As discussed earlier in this opinion, see Section II(B), only one part of plaintiffs' claims, that of reporting alleged insurance billing fraud, falls under the WPA. In addition to our earlier discussion, *Landin* held that because "[t]here is no requirement that in order to establish a claim of malpractice, one must necessarily allege a violation of the Public Health Code," WDPP claims are not preempted by the WPA. *Landin*, 305 Mich App at 533. The same conclusion obtains in this case because plaintiffs never alleged that they reported a specific violation of a section of the public health code, but instead, generally alleged that they reported that Dr. Ewing committed malpractice. See *id*. at 532-533. Plaintiffs have impliedly acknowledged that only their reports of malpractice can be maintained as a WDPP claim, because in this appeal they have argued only the applicability of *Landin*. Thus, we address the trial court's conclusion that *Landin* was not applicable here.

*Landin* involved an at-will nurse employed by a nonprofit community hospital, who was fired after he reported suspected malpractice by a coworker. The plaintiff nurse believed that his coworker's negligence resulted in the death of a patient. *Id*. at 522. The plaintiff nurse brought suit, alleging a violation of the WDPP for the retaliatory firing. *Id*. The defendant hospital moved for summary disposition on the ground that the plaintiff nurse's claim was preempted by the WPA. *Id*. The trial court denied the defendant hospital's motion for summary disposition on the basis of MCL 333.20176a(1)(a), which prohibited hospitals from firing employees for reporting suspected malpractice. *Landin*, 305 Mich App at 522. On appeal, this Court affirmed, reasoning that "MCL 333.20176a contains an explicit legislative statement prohibiting discharge or discipline of an employee for specified conduct," which included reporting "the malpractice of a health professional." *Id*. at 521, 528-529. In light of that "explicit legislative statement," this Court concluded that the Legislature intended to further Michigan's public policy to "safeguard the public health and protect the public from incompetence, deception, and fraud . . . by prohibiting retaliation against an employee who reports malpractice." *Id*. at 529-530. In conclusion, this Court determined that "because the statutory basis for [the] plaintiff [nurse]'s public policy claim could support a public-policy-based wrongful discharge claim, the trial court did not err by denying [the] defendant [hospital]'s motions for summary disposition." *Id*. at 532. Plaintiffs insist that the *Landin* decision is applicable and binding with respect to their case.

The question we must consider, is whether the "public policy" recognized by *Landin* also applies to plaintiffs' reporting of Dr. Ewing's malpractice. As did the plaintiff nurse in *Landin*, plaintiffs in this case rely on MCL 333.20176a(1)(a), which in pertinent part provides, "[a] health facility or agency shall not discharge . . . an employee . . . because the employee . . . [i]n good faith reports . . . the malpractice of a health professional . . . ." MCL 333.20176a(1)(a) applies only to employees of a "health facility or agency." The public health code defines those terms in the following manner:

(1) "Health facility or agency", except as provided in [MCL 333.20115[4]] means:

> (a) An ambulance operation, aircraft transport operation, nontransport prehospital life support operation, or medical first response service.
>
> (b) A county medical care facility.
>
> (c) A freestanding surgical outpatient facility.
>
> (d) A health maintenance organization.
>
> (e) A home for the aged.
>
> (f) A hospital.
>
> (g) A nursing home.
>
> (h) A hospice.
>
> (i) A hospice residence.
>
> (j) A facility or agency listed in subdivisions (a) to (g) located in a university, college, or other educational institution. [MCL 333.20106(1).]

The statutory definition of a "health facility or agency" excludes a private dental office. *Id*. Indeed, plaintiffs do not allege that any of the definitions apply to the dental office for which they worked. Instead, they argue more generally that the public health code should be applied liberally to protect patients receiving medical and dental care. Nevertheless, our Supreme Court has been abundantly clear that in determining public policy in the context of a WDPP claim, the judiciary may consider only objective legal sources. *Terrien*, 467 Mich at 66. The Michigan Legislature has chosen, for policy reasons, to omit dental offices from the protections regarding retaliatory firings for reporting malpractice, MCL 333.20176a(1)(a); MCL 333.20106(1), and we are bound by that public policy determination. See *Terrien*, 467 Mich at 66.

Consequently, because the public health code has no "explicit legislative statement" regarding the retaliatory firing of an employee for reporting dental malpractice in a private dental office, summary disposition as to those claims was warranted. See *Suchodolski*, 412 Mich at 695; *Landin*, 305 Mich App at 530. Thus, the trial court properly denied plaintiffs' motion for partial

---

[4] MCL 333.20115(1) permits the department of Licensing and Regulatory Affairs (LARA) to further define "health facility or agency . . . as required to implement this article." The administrative rule promulgated by LARA does not mention dental offices in the definition. Mich Admin Code, R 325.45105(b).

summary disposition as related to their WDPP claims, and properly granted defendants' motions for summary disposition

## IV. CONCLUSION

For the reasons stated in this opinion, only Shephard's claim of a violation of the WPA presents a factual dispute sufficient to preclude summary disposition. Plaintiffs' remaining claims, however, are subject to summary disposition. Consequently, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Mark T. Boonstra
/s/ Michael F. Gadola
/s/ Jonathan Tukel